[L. A. No. 25061.   In Bank.   Oct. 2, 1958.]

CARYL CHESSMAN, Petitioner, v. SUPERIOR COURT
OF LOS ANGELES COUNTY et al., Respondents;
THE PEOPLE, Real Party in Interest.

Caryl Chessman, in pro. per., for Petitioner.

No appearance for Respondents or Real Party in Interest.

SCHAUER, J.—Petitioner seeks a writ of mandate direct-ing respondent court to take the following action in connection with proceedings before it which resulted in the resettlement of a reporter's transcript on appeal in *People* v. *Chessman* (Crim. No. 5006 in the files of this court) :

"1. To vacate . . . its March 13, 1958 nunc pro tunc minute 'order' appointing Stanley Fraser an expert under § 1871 of the Code of Civil Procedure[1] . . . with instructions that if it again wishes to attempt to make such an order (assuming this Court finds it has the power to do so under any circumstances) it must put Chessman on notice, produce him and allow him to be heard in opposition;

---

[1]Section 1871 provides for appointment of expert witnesses by the court and for their compensation.

"2. To recall the record on appeal in Crim. 5006 from this Court and grant Chessman a hearing and an opportunity to be personally heard in opposition to its informal action in making changes and corrections, ninety in number, in the changes and corrections it had finally ordered in the original trial transcript, and to resolve this matter in accordance with the controlling principles of procedural due process required by *Chessman* v. *Teets*, 354 U.S. 156 [77 S.Ct. 1127, 1 L.Ed. 2d 1253]; and

"3. To order, under § 1218 of the Penal Code,[2] preparation and transmittal to the Governor of California [of] a complete and properly authenticated copy of the Clerk's and Reporter's Transcripts of the Settlement Proceedings, along with photostatic copies of the exhibits received in evidence (excepting court records)."

We have concluded:

1. Petitioner cannot attack the *nunc pro tunc* order because that order had no bearing on the merits of the resettlement proceedings and no effect upon any right of petitioner.

2. It well may be that no hearing as to the 90 changes was necessary because they were made in the exercise of the court's inherent power to correct clerical misprisions which are apparent on the face of the record and which do not affect petitioner's substantial rights. However, to expedite ultimate disposition of this matter, petitioner should be expressly afforded the opportunity to appear before respondent court, in person or by counsel, and to be heard as to such changes.

3. Section 1218 of the Penal Code does not contemplate transmittal to the governor of copies of exhibits or of transcripts of mesne proceedings for settlement of the reporter's transcript on appeal from the judgments of conviction. However, in the circumstances of this case, petitioner's request will be granted in respect to the transcripts of the mesne proceedings, but not in respect to copies of exhibits.

There is now pending before us an appeal in Crim. No. 5006. In disposing of that appeal we will, in the exercise of our inherent power to pass upon all questions as to preparation of the record on appeal (see *Cross* v. *Superior Court* (1951), 104 Cal.App.2d 594, 595-596 [3] [232 P.2d 255]),

[2] Section 1218 provides that the judge of the court in which a judgment of death is had must transmit to the governor "a statement of the conviction and judgment, and of the testimony given at the trial."

review the resettlement proceedings. Therefore, petitioner could advance his present contentions on appeal. However, we agree with petitioner that ultimate disposition of that appeal may be facilitated if those contentions are considered at this time.

The following circumstances led to this mandate proceeding:

Petitioner appealed from judgments of conviction of 17 felonies, including two judgments of death. The official court reporter, Mr. Ernest Perry, died before he had completed dictating his notes of the trial. Another official reporter, Mr. Stanley Fraser, under court order prepared a transcript of the balance of Mr. Perry's notes. Petitioner, who was confined in San Quentin State Prison under the 17 sentences, requested and was granted a hearing in respondent court on the questions whether Perry's notes were legible, whether Fraser could read them, and whether the transcript was "usable"; at this hearing petitioner also presented some proposed specific changes in the transcript. Petitioner was not personally present at the hearing because he was not permitted to leave the prison in which he was confined. He was not and did not ask to be represented by counsel, but participated in the hearing by the filing of documents in propria persona. The judge rejected petitioner's general complaints as to the transcript, allowed some proposed specific changes, and settled and certified the transcript.

In *People* v. *Chessman* (1950), 35 Cal.2d 455 [218 P.2d 769, 19 A.L.R.2d 1084], petitioner by motions in this court attacked the reporter's transcript and the proceedings by which it was produced. At his request, this court's appointment of counsel to represent him before us was terminated and he conducted his case in propria persona by written documents. We held that (p. 462 [11] of 35 Cal.2d) "Examination of the record in the light of defendant's claims discloses that it is adequate to permit us to ascertain whether there has been a fair trial and whether there has been any miscarriage of justice"; that (p. 467 [15] of 35 Cal.2d) because petitioner was lawfully imprisoned he was not entitled to appear personally in the courtroom in settlement proceedings; and that because prior to his conviction he had repeatedly been offered and refused counsel in the trial court and because he had persisted in this court in his refusal to appear by counsel, he could not complain that he was prejudiced by

the fact that since his conviction he had not been allowed to leave the prison to appear personally in court.

In *People* v. *Chessman* (1951), 38 Cal.2d 166, 172 [238 P.2d 1001], we again considered and rejected petitioner's arguments as to the reporter's transcript and affirmed the judgments of conviction.

After federal and state courts had rejected many attacks by petitioner upon the reporter's transcript and the proceedings which produced it, the United States Supreme Court held, in *Chessman* v. *Teets* (1957), 354 U.S. 156, 162 [77 S.Ct. 1127, 1 L.Ed.2d 1253], that "the *ex parte* settlement of this state court record violated petitioner's constitutional right to procedural due process. . . . If California chose to deny petitioner's request to appear in those proceedings *in propria persona,* it then became incumbent on the State to appoint counsel for him."

Pursuant to the quoted holding of the supreme federal court and ensuing orders of the United States District Court (August 14, 1957) and of this court (August 29, 1957) obedient thereto, new hearings directed to the adequacy and correctness of the reporter's transcript were had in respondent court (Judge Walter R. Evans, assigned). At these hearings petitioner was allowed to leave the prison, to appear personally and actively represent himself, and to be actively represented by counsel of record whenever he so desired.

Among the witnesses for the People at the resettlement hearings was Stanley Fraser, the reporter who had transcribed the undictated notes of the deceased reporter Perry.

On February 28, 1958, with petitioner and his counsel present, respondent court by minute order denied a motion of petitioner which asked, among other things, that the court "reject the present reporter's transcript" and "find that no usable or adequate reporter's transcript can be prepared from Ernest R. Perry's shorthand notes." Further, by written order filed on February 28, 1958, respondent court found "that the shorthand notes of Mr. Perry were decipherable and that Mr. Frazier [sic] was competent and qualified to transcribe and did so transcribe those notes fairly and in a substantially accurate manner"; attached to and made a part of the order is a list of about 2,000 "changes to be made by the Clerk of this Court" in the 2,102 pages of the original reporter's transcript. The changes appear both in the 646 pages of transcript which were dictated by Perry and in the portion of the transcript which was prepared by

Fraser. The court found that these changes "in no way change the substance and nature of either the People's case or the defendant's defense."

On March 11, 1958, petitioner was returned to San Quentin. On March 13, 1958, Judge Evans, without notice or hearing, made the order which *nunc pro tunc* appointed Fraser "to testify as an expert witness in Pittmanic [sic] Shorthand."

A corrected reporter's transcript on appeal was prepared. In this transcript there are 90 changes, made without notice or hearing and without any order appearing in the record before us, in the changes which were set forth in the order of February 28, 1958. On May 1, 1958, Judge Evans certified the corrected reporter's transcript.

Petitioner, acting in propria persona, forwarded to respondent court "Objections, Proposed Corrections, and Application for a Hearing." This document asks relief in the three respects as to which petitioner now seeks mandate. On June 16, 1958, Judge Evans denied such relief.

*The Nunc Pro Tunc Order.* The minute order of March 13, 1958, made without notice or hearing, is as follows: "The minute order of November 27, 1957, [is] amended nunc pro tunc as of that date to add to said minute order the following terminology: 'Stanley Fraser is appointed under the provisions of Section 1871, Code of Civil Procedure to testify as an expert witness in Pittmanic [sic] Shorthand,' it being the intention of the Court to have made the above appointment to be included in the minute order of November 27, 1957." November 27 was the second day on which Fraser testified in the resettlement proceedings.

Section 1871 of the Code of Civil Procedure provides that the court or judge may appoint experts to investigate and testify and may fix reasonable compensation for services, if any, rendered by them in addition to their services as witnesses; *that in criminal proceedings such compensation shall be paid out of the county treasury*; that expert witnesses called by a party and not appointed by the court are entitled to "ordinary witness fees only"; and that a court-appointed expert may be called as a witness by any party or by the court itself.

The order of March 13, 1958, was manifestly made for the sole purpose of enabling the judge, under the authority of section 1871, to order (as he did on March 21, 1958) that Fraser be compensated out of the county treasury as a court-appointed expert rather than be paid "ordinary [$4.00 a

day] witness fees only." (See Pen. Code, § 1329.) Such order has no relation to and could not affect the determination of the merits of the resettlement proceedings.

Petitioner's claim that the *nunc pro tunc* order prejudicially affects him are based on his mistaken assumptions that Fraser did not testify as an expert and that the *nunc pro tunc* order purports retroactively to confer expertness upon Fraser and to give his testimony an effect which it did not have at the time he testified. However, petitioner and his counsel expressly recognized at the resettlement hearings that Fraser was produced as an expert and cross-examined him as to his qualifications and bias in that regard. Obviously the *nunc pro tunc* order has no application to the effect to be accorded Fraser's testimony, and this court on its review of the resettlement proceedings will not give it any such application. Therefore, since petitioner is not aggrieved by the order, he has no standing to attack it.

█ *The 90 Changes, Made without Notice, Hearing, or Order of Record, in the Changes which Appear in the Order of February 28, 1958.* Because of obvious clerical errors in the list of changes ordered on February 28, 90 of such changes either could not be made in accord with the language of the order of February 28 or, if they had been so made, would have been unintelligible or obviously incorrect. In the corrected reporter's transcript, some of these 90 changes were not made and some were made in a manner different from that specified in the order. The 90 respects in which the corrected reporter's transcript does not conform to the language of the order of February 28, 1958, are listed on the first page of each volume of such transcript and (pursuant to order of June 16, 1958) are entitled "Corrections and Changes Ordered and Made Subsequent to the Order of February 28, 1958 and Prior to Final Approval by the Court."

Regardless of whether the 90 changes could in any way affect this court's consideration and disposition of the appeal from the judgments of conviction, we assume for the purpose of expediting disposition of this proceeding (but without so holding) that in view of the language of the order and the opinion pursuant to which this case has been returned to us (see *Chessman* v. *Teets* (1957), *supra,* 354 U.S. 156, 164, note 12), lack of a hearing as to the 90 changes cannot be excused upon the basis of a determination that such changes are immaterial.

The making of the 90 changes may have been but the

exercise of the inherent power of respondent court, without notice or hearing, to correct obvious clerical errors which did not affect petitioner's substantial rights (see *Estate of Hultin* (1947), 29 Cal.2d 825, 829-830 [1, 2] [178 P.2d 756]), and it may be that such a procedure did not transgress the decision of the United States Supreme Court that Chessman was entitled to be represented throughout the settlement proceedings in person or by counsel (*Chessman* v. *Teets* (1957), *supra*, 354 U.S. 156, 162). However, it is not entirely clear from the record before us that the 90 changes involved no judicial determinations. ▮ Respondent court could not properly, without notice, amend such determinations. (*Beyerbach* v. *Juno Oil Co.* (1954), 42 Cal.2d 11, 28 [21] [265 P.2d 1].) ▮ In the circumstances it appears proper that Chessman be afforded the opportunity to appear and be heard, in person or by counsel, as to all the 90 changes.

The new hearing will result in a new order. It is therefore unnecessary to discuss the effect of the absence from the record now before us of an order directing such 90 changes.

*The Refusal to Send the Governor a Copy of the Record of the Resettlement Proceedings.* Petitioner urges that "in the unique circumstances of this case" section 1218 of the Penal Code requires that the judge before whom the resettlement proceedings were had transmit to the governor copies of the clerk's and reporter's transcripts of the resettlement proceedings and photostatic copies of the exhibits received in evidence at those proceedings (except court records).

▮ Section 1218 of the Penal Code provides, "The judge of the court at which a conviction requiring judgment of death is had, must, immediately after the conviction, transmit to the governor . . . a statement of the conviction and judgment, and of the testimony given at the trial."

Certainly by its language the above quoted section does not purport to require that any transcript of mesne proceedings to settle the trial transcript shall be forwarded to the governor. But it is to be recognized that the mesne proceedings do relate to the content of the trial transcript. Petitioner appears to believe that it might be important to him to have a copy of the transcript of the mesne proceedings in the hands of the governor. It has been said that "Exacting as the state may be in ultimately bringing retribution to those who violate its highest laws, it is at least equally solicitous that those who are prosecuted shall be accorded full measure of every legal right." (*People* v. *Gilbert* (1944), 25 Cal.2d 422, 442 [12]

[154 P.2d 657].)  █  It is also the policy of California (see e.g., *People* v. *Stuart* (1956), 47 Cal.2d 167, 175 [7] [302 P.2d 5, 55 A.L.R.2d 705]) to construe and apply penal statutes as favorably to the defendant as the language of the statute and the circumstances of its application may reasonably permit.  █  Under all the circumstances of the case at bar we conclude that it is proper to direct transmittal to the governor of copies of the transcripts of the resettlement proceedings.

As has been stated, petitioner also asks that the above mentioned transcripts be accompanied by photostatic copies of exhibits "excepting court records." The exhibits in the resettlement proceedings "excepting court records" include more than 89 books, papers, and documents. Section 1218 of the Penal Code does not, as we understand it, contemplate transmission of copies of exhibits to the governor.  █  It is not the practice of this court to require, and the Rules on Appeal (see rule 33) do not provide for, the inclusion of copies of exhibits in the transcript. When examination of exhibits appears to be necessary or desirable in the determination of an issue before us, we have such exhibits transmitted to us. No doubt if it became material in any application to the governor for him to examine an exhibit or exhibits, arrangements to that end could easily be made. In any event it is unnecessary that copies of the exhibits be made and included with the transcripts to be sent to the governor at this time.

For the reasons above stated it is ordered as follows:

1. The application for an order requiring respondent court to vacate its March 13, 1958, minute order and for instructions to respondent court pertaining to such matter is denied.

2. The application for an order directing transmittal to the governor of photostatic copies of exhibits is denied.

3. The original reporter's transcript and the corrected reporter's transcript on appeal from the judgments of conviction in Crim. No. 5006 are returned to respondent court.

4. Let a peremptory writ of mandate issue directing respondent court to explicitly grant petitioner an opportunity to be heard in person or by counsel in opposition to its action with respect to its changes in the "Order re Hearing on Objections" filed February 28, 1958, which changes are described in the corrected reporter's transcript as "Corrections and Changes Ordered and Made Subsequent to the Order of February 28, 1958 and Prior to Final Approval by

the Court.'' The order determining petitioner's objections to such ''Corrections and Changes'' shall be made, and the making of the corrections and changes pursuant thereto shall be accomplished, in the presence of petitioner or his counsel, or after express notice and opportunity given them to be present. When petitioner's objections to such ''Corrections and Changes'' have been heard and determined, and the corrections and changes as ordered have been actually made, respondent court shall certify the corrected reporter's transcript.

Such peremptory writ of mandate shall also direct respondent court to transmit to the governor of California complete, authenticated copies of the clerk's and reporter's transcripts of the resettlement proceedings.

This order is final forthwith.

Gibson, C. J., Shenk, J., Traynor, J., Spence, J., and McComb, J., concurred.

Carter, J., concurred in the order.