[Crim. No. 5006. In Bank. July 7, 1959.]

THE PEOPLE, Respondent, v. CARYL CHESSMAN,
Appellant.

Caryl Chessman, in pro. per., for Appellant.

Edmund G. Brown and Stanley Mosk, Attorneys General, Clarence A. Linn, Chief Assistant Attorney General, Arlo E. Smith and Preble Stolz, Deputy Attorneys General, for Respondent.

SCHAUER, J.—Defendant appeals from judgments of conviction of 17 felonies, rendered pursuant to jury verdicts, and from an order denying his motion for new trial. Upon two counts (kidnaping for robbery with infliction of bodily harm) the punishment was fixed at death. Defendant argues that the trial judge required him to go to trial without opportunity to obtain counsel of his choice, to prepare, and to effectively represent himself. He presents contentions as to asserted prejudicial errors of the trial judge and prejudicial misconduct of the prosecuting attorney at the trial on the merits. He attacks the sufficiency and correctness of the reporter's transcript on appeal, and the propriety and constitutionality of proceedings in which that record was produced, settled, and resettled. Defendant further urges that California, since the rendition of the judgments of conviction on June 25, 1948, has denied him equal protection and punished him cruelly and unusually by restraining him pursuant to such judgments while the various matters of which defendant complains were being litigated and relitigated. And he contends that the

justices of this court are "jurisdictionally foreclosed from discharging their duties." We have concluded that these and his other contentions hereinafter described are without merit.

For convenience in ensuing discussion we again adopt the numbering of the crimes of which defendant was convicted which we employed in *People* v. *Chessman* (1951), 38 Cal.2d 166, 171-172 [238 P.2d 1001]. Each paragraph indicates, and identifies by date and description, a separate general criminal enterprise, in each of which one or more offenses were committed. Defendant was identified by victims of the various criminal enterprises, except the victim of crime (2).

January 3, 1948: (1) First degree robbery of McCullough, clerk in a store where shoes were sold, by defendant (armed with a .45 caliber automatic pistol) and another man.

January 13, 1948: (2) Grand theft of an automobile with a spotlight. This car was taken in the owner's absence. A car of similar description was used in perpetrating subsequent crimes. Defendant was fleeing in the stolen car when he was apprehended.

January 18, 1948: (3) First degree robbery of Bartle. Bartle and a young woman were driving along the Coast Highway when they were stopped by defendant, who drove a car with a red spotlight which he flashed on Bartle's car. Defendant was armed with a .45 automatic. (The car stolen in crime (2) had a spotlight with a clear rather than a red lens. Defendant himself, as he admitted on cross-examination, introduced a possible explanation of the red spotlight into the proceedings when he asked Bartle, at the preliminary examination, "Well, had there been some cellophane around the spotlight?" to which Bartle replied, "That I would not know.")

January 18, 1948: (4) First degree robbery of Ballew, who was parked at an isolated place with a woman companion. Defendant drove up, flashed a red spotlight which was mounted on the car he drove, displayed a .45 automatic, and used a small flashlight.

January 19, 1948: (5) First degree robbery of Lea. (6) First degree robbery of Regina. (7) Kidnaping Regina for robbery, with infliction of bodily harm; punishment fixed at death. (8) Violation of Penal Code, section 288a, committed against Regina. Mr. Lea and Regina were parked in an isolated place. Defendant approached in a car, from which he flashed a red spotlight, and threatened the victims with a 45 automatic.

January 20, 1948: (9) First degree robbery of Stone, who was parked in an isolated place with a girl. Stone testified that he "would suspect" that defendant was the robber. The robber approached in a car from which he flashed a red spotlight, displayed a .45 automatic, and used a small flashlight.

January 22, 1948: (10) Attempted robbery of Hurlburt. (11) Kidaping Mary for robbery, with infliction of bodily harm; punishment fixed at death. (12) Attempted rape of Mary. (13) Violation of Penal Code, section 288a, committed against Mary. In these crimes, too, the victims were parked at an isolated place. Defendant flashed a red spotlight mounted on the car which he drove, produced a .45 automatic, and used a flashlight. Mary testified that after he had forced her into his car, driven her some distance to another isolated place, and sexually assaulted her, defendant went to the spotlight of the car and she heard a click, a rustling, and the sound of defendant placing something metallic in the back seat and in the glove compartment of his car.

January 23, 1948: (14) First degree robbery of Waisler. (15) First degree robbery of Lescher. (16) Kidnaping Waisler for robbery, with infliction of bodily harm; punishment fixed at life imprisonment without possibility of parole. (17) Kidnaping Lescher for robbery. Defendant and David Knowles, one armed with a .45 automatic and one with a toy gun, "held up" the clothing store in which Waisler, the proprietor, and Lescher, a clerk, were working, and committed the crimes described in *People* v. *Knowles* (1950), 35 Cal.2d 175 [217 P.2d 1].

About two hours after the commission of the last mentioned group of crimes defendant, driving the stolen car with Knowles as a passenger, saw two police officers in a distinctively marked traffic car apparently observing defendant's car. (The officers had received a radio call to look out for a car of the description of the one driven by defendant.) Even before the officers turned on their red light and sounded their siren, defendant fled. After a wild chase the car driven by defendant went out of control, the officers rammed it, defendant attempted to flee on foot, and he and Knowles were captured. As defendant left the car a .45 automatic fell to the pavement. In defendant's pocket, among other things, was change wrapped in a manner similar to change which had been stolen from Waisler's store. In the stolen car were clothing and a wallet which had been stolen from Waisler and Lescher.

The jury found that defendant was armed with a deadly

weapon at the time of the commission of each of the above crimes except that numbered (2), and at the time of his arrest. (Pen. Code, § 969c, provides for allegations and findings as to these matters.) The jury further found that defendant had suffered previous convictions of two robberies and of assault with a deadly weapon. (Pen. Code, §§ 969, 969a, require that the prosecution charge prior felony convictions.) Defendant was also charged with and acquitted of one count of burglary.

Upon the record there is no substantial question of sufficiency of proof. The evidence of the commission of the offenses was not contradicted. When defendant was apprehended he was driving the automobile which was the subject of crime (2); he was identified by the victims as the perpetrator of the other crimes of which he was convicted; and he was connected with such crimes by real evidence in his possession at the time of his capture. Defendant testified that he did not commit the charged crimes and introduced testimony of alibi witnesses as to some of them.

At no time since the original reporter's transcript of the trial was prepared has defendant made it appear that the transcript does not adequately and substantially reflect the nature of the People's case and of his defense. But since rendition of the judgments of conviction on June 25, 1948, he has sought to avoid their execution, and to secure a new trial, on the theory (among others) that under California's statutory provision for automatic appeal from judgments of death (Pen. Code, § 1239, subd. (b)), its constitutional provisions for Supreme Court review of the record of proceedings leading to such judgments (Cal. Const., art. VI, §§ 4, 4½), and its Rules on Appeal providing for preparation of such record, he was denied due process and equal protection because, after the trial but before the transcript had been completed, the official court reporter died and transcription of the notes of the oral proceedings was completed by another official reporter. In state and federal courts he has iterated and reiterated charges (in substance or effect) that the transcript does not present a reasonably accurate and complete record of the evidence and other oral proceedings but is a fabrication of falsities constructed through the fraudulent and conspiratorial collaboration of the trial judge, the prosecuting attorney, and the substitute reporter, concocted in an ex parte proceeding wherein the state did not permit defendant to participate either in person or by counsel. His charges that the record

is inadequate, prejudicially inaccurate, and fraudulent have been found to be false by every court which has passed on the facts. Pursuant to remand of the United States Supreme Court in *Chessman* v. *Teets* (1957), 354 U.S. 156 [77 S.Ct. 1127, 1 L.Ed.2d 1253], and implementing orders and proceedings obedient to the remand, all as hereinafter more particularly recounted, the matter is now before us both on the original appeal from the judgments of conviction to be resolved on the resettled transcript, and for review of the resettlement of transcript proceedings.

*History of the Disputed Reporter's Transcript of the Trial.* The verdicts were returned on May 21, 1948. Mr. Ernest R. Perry, the official court reporter who had reported the trial, died unexpectedly of acute coronary thrombosis on June 23, 1948, before transcription of his shorthand notes had been completed. On June 25, 1948, the trial judge, the Honorable Charles W. Fricke, denied defendant's motion for a new trial, pronounced judgments, and denied defendant's motion to set aside the judgments on the ground of Mr. Perry's death.

The procedure for preparation of a reporter's transcript in the event of the reporter's death was not expressly delineated by statute or rule and it was, therefore, the court's power and duty to create a procedure. (See *Swift* v. *Superior Court* (1952), 39 Cal.2d 358, 364 [9] [247 P.2d 6]; *People* v. *Jordan* (1884), 65 Cal. 644, 646-647 [4 P. 683]; Code Civ. Proc., § 187.) Therefore, on June 25, 1948, Judge Fricke made the following order: "It appearing to the Court that there is a necessity, . . . in the proper administration of justice and to the limit of human beings in their use of human ingenuity, that the entire record of this trial be prepared in as complete a manner as possible so that full justice may be done this defendant, the Clerk of this Court . . . is directed to request the County Board of Supervisors to provide for such service and adequate compensation therefor, to the end that this record may be as full and complete as possible, and to include everything that occurred during the course of the trial up to and including the verdict."

One week after rendition of judgment, defendant was taken to San Quentin State Prison as required by law. (Pen. Code, §§ 1202a, 3600.)

Under direction of Judge Fricke, Mr. J. Miller Leavy, the deputy district attorney who had prosecuted the case, found another official reporter, Mr. Stanley Fraser, who said that he was able to read Perry's notes, and Mr. Fraser, under

contract with the board of supervisors, prepared a transcript of the portion of the notes which had not been dictated by Mr. Perry and typed by the transcriber who had been employed by Perry. The ensuing transcript comprises 2,102 pages, of which 646 were dictated by Perry before his death.

In November, 1948, defendant filed and this court denied without opinion a petition for prohibition (Crim. 4950) attacking the method by which the reporter's transcript was being prepared. The petition is in propria persona, but the affidavit of mailing is by Attorney Rosalie S. Asher. (As hereinafter appears, since the summer of 1948 defendant has had the legal services of Miss Asher, sometimes as adviser and sometimes as attorney of record.)

On June 3, 1949, Judge Fricke certified the transcript after proceedings (more fully recounted in *People* v. *Chessman* (1950), 35 Cal.2d 455, 458-467 [218 P.2d 769, 19 A.L.R.2d 1084]) in which defendant appeared by in propria persona documents. The judge did not grant defendant's request to leave the prison[1] and be present in person in those proceedings; defendant did not ask appointment of counsel; and the judge did not require appointment of counsel on his behalf.[2] The judge accepted and incorporated in the transcript about 80 of the some 200 specific suggestions urged by defendant in propria persona.

Defendant attacked the transcript by motions in this court. In a brief filed on September 15, 1949, he commended Miss Asher for her "generous advisory interest . . . and well-rendered service" on his behalf. On September 21, 1949, at defendant's request, this court appointed Miss Asher as counsel for defendant, and on September 23, 1949, at his further request, we relieved her of the appointment. In *People* v. *Chessman* (1950), *supra,* 35 Cal.2d 455, 467 [15], we concluded that under the law of this state and the circumstances of this case

---

[1]At all times here concerned Penal Code, section 3600, mentioned *supra,* has provided that "Every male person, upon whom has been imposed the judgment of death, shall be delivered to the warden of the California State Prison designated by the department [formerly the state board of prison directors] for the execution of the death penalty, there to be kept until the execution of the judgment." Likewise at all times concerned San Quentin has been the prison designated for the detention (and execution) of male prisoners under sentence of death.

[2]It will be remembered that the settlement of the transcript was a duty devolving on the judge as a result of the preceding trial in which the defendant had repeatedly and obdurately insisted on representing himself, and the court had been of the view that it could not compel defendant to accept counsel.

defendant was not entitled to be personally present in the settlement proceedings before Judge Fricke.[3]

On June 10, 1957, in *Chessman* v. *Teets* (1957), *supra*, 354 U.S. 156, on certiorari after the federal district court discharged a writ of habeas corpus and the court of appeals affirmed, the United States Supreme Court held that "If California chose to deny petitioner's request to appear in those proceedings [the settlement proceedings before Judge Fricke in 1949] *in propria persona*, it then became incumbent on the State to appoint counsel for him" (p. 162 of 354 U.S.) and remanded the case to the district court "with instructions to enter such orders as may be appropriate to allow California a reasonable time within which to take further proceedings not inconsistent with this opinion, failing which the petitioner shall be discharged" (p. 166 of 354 U.S.).

*Resettlement of Transcript Proceedings.* Pursuant to the opinion and direction of the United States Supreme Court and orders of the district court and this court obedient thereto, new hearings as to the rejection or resettlement of the reporter's transcript were had. Prior to these hearings the Los Angeles Superior Court granted defendant's motion that he be removed from San Quentin Prison to the Los Angeles County jail. From September 23, 1957, through November 22, 1957, defendant in the flesh appeared before the Los Angeles Superior Court on 12 occasions and orders enabling defendant to prepare for the resettlement hearings were made; e.g., defendant was furnished an office and personal access to law books and records and it was ordered that defendant "be allowed to confer freely and privately with his counsel, witnesses, expert witnesses, investigators, and other responsible persons connected with . . . the preparation of this matter on any day between . . . 9:00 a.m. and 3:00 p.m., . . . 3:30 p.m. and 5:00 p.m, and . . . 6:00 p.m. and 9:00 p.m."

Defendant's objections to the transcript, filed November 18, 1957, fully state the matters which he proposed to, and did, present at the resettlement hearings. Beginning on November 25, 1957, the Honorable Walter R. Evans, judge assigned to the Los Angeles Superior Court, for 42 court days heard

---

[3]Further history of the first nine years of defendant's attacks on the transcript in state and federal courts is recounted in *People* v. *Chessman* (1950), *supra*, 35 Cal.2d 455, 458-467; *In re Chessman* (1954), 43 Cal. 2d 391, 393-404 [274 P.2d 645]; *In re Chessman* (1955), 128 F.Supp. 600, 601-602; *Chessman* v. *Teets* (1957), *supra*, 354 U.S. 156, see also dissenting opinion of Justice Douglas, p. 166, and appendix thereto, p. 173 of 354 U.S.; and Appendix II to this opinion. [See *post*, p. 503.]

testimony and received documentary evidence concerning the legibility of Perry's notes, the ability of Fraser to transcribe them, and the correctness of the reporter's transcript (both the 646 pages which had been dictated by Perry before his death and the 1,456 pages prepared by Fraser). The witnesses included, among others, persons who had been at the trial (Judge Fricke, his former courtroom clerk, Deputy District Attorney Leavy, Attorney Al Matthews, who was defendant's court-appointed legal adviser during the trial, defendant, jurors and witnesses), the substitute reporter Mr. Fraser, and shorthand experts who had studied and appraised Perry's notes and Fraser's transcript (Bessie Lill, court-appointed expert who testified for the People, Frank Hanna, court-appointed expert who testified for the defendant, Mrs. Mollie Kalin, court-appointed expert who was relieved of her appointment at her request and assisted and testified for defendant). During the resettlement hearings defendant was allowed both to actively represent himself and to be represented by counsel of his choice. On February 14, 1958, after two days of oral argument, following the 42 days of taking evidence, the matter was submitted.

On February 28, 1958, Judge Evans by minute order denied defendant's motions (made and submitted on December 20, 1957, and February 13, 1958) that the court "reject the present reporter's transcript in entirety," "find that no usable or adequate reporter's transcript can be prepared from Ernest R. Perry's shorthand notes," and "If the Court remains in doubt as to whether a usable and adequate reporter's transcript can or cannot be prepared from Ernest R. Perry's shorthand notes, to appoint an impartial expert to study the notes and then to appear in court and demonstrate whether or not the notes can be transcribed with any reasonable degree of accuracy and certainty." By written order Judge Evans found that Perry's notes were decipherable; that Fraser was competent to and did transcribe them "fairly and in a substantially accurate manner"; that defendant's claims that the transcript was fraudulently prepared are baseless; that some 2,000 changes (listed in Exhibit A to the order) should be made in the transcript but that "individually or collectively, [these changes] in no way change the substance and nature of either the People's case or the defendant's defense." All defendant's objections to the transcript except those included in Exhibit A were disallowed and the clerk was ordered to make the listed changes. When the written order of Febru-

ary 28, 1958, was filed the judge said in open court that "We may find some typographical errors . . . because of the fact that we rather rapidly tried to get it typed." Subsequent developments suggest prescience in the quoted remark.

Defendant was returned to San Quentin. Typists employed by the clerk to prepare the corrected reporter's transcript discovered that because of apparent typographical or clerical errors in the preparation or typing of Exhibit A, 90 of the ordered changes could not be made, or, if they had been made, would have produced unintelligibility or manifest incorrectness. Without notice, adversary hearing, or order of record, Judge Evans upon consideration of the difficulty instructed the typists that some of these 90 changes ordered on February 28 should be made in different manner and others should not be made, and this was done.

On May 1, 1958, Judge Evans certified a corrected reporter's transcript of the trial. Such transcript, and the transcript of the resettlement proceedings, were sent to defendant in San Quentin. He mailed to the superior court his "Objections, Proposed Corrections, and Application for a Hearing," which were, so far as is here material, denied. On July 2, 1958, defendant sought mandate from this court to compel the superior court, among other things, to grant a hearing as to the 90 changes. On October 2, 1958, we ordered the superior court "to explicitly grant petitioner an opportunity to be heard in person or by counsel in opposition to its action with respect to its [90] changes in the 'Order re Hearing on Objections' filed February 28, 1958." (*Chessman* v. *Superior Court,* 50 Cal.2d 835, 843 [330 P.2d 225].) Our order was made on the express assumption (not a holding) that in view of *Chessman* v. *Teets* (1957), *supra,* 354 U.S. 156, 164, note 12, "lack of a hearing as to the 90 changes cannot be excused upon the basis of a determination that such changes are immaterial."

*"Re-Resettlement" Hearing.* Pursuant to superior court order of October 10, 1958, defendant was returned to the Los Angeles county jail. By written objections filed in the superior court on November 18, 1958, he stated, among other things, that at the "re-resettlement" hearing he would stipulate to 26 of the 90 changes;[4] he would show that some of the other changes ordered on February 28, 1958, could not be made

---

[4]For example, Exhibit A of the February 28 order states, " [page] 117 [line] 3 'Q: It was not a club coupé?' (Insert 'not')." Page 117, line 3, of the original reporter's transcript reads, "A: Yes." But at page 117, line 23, appears "Q: It was a club coupé?" and the ordered correction was made there.

literally because that order contained typographical errors as to page and line numbers and he would supply the correct numbers;[5] and he proposed to show that still others of the 90 changes involved judicial determinations or redeterminations.[6] Defendant's objections of November 18, 1958, further state that "at the hearing he will be prepared to accept the burden of proof and put into the record the competent, relevant and material evidence he has gathered to support . . . his position" that Judge Evans made judicial determinations without notice to defendant.

At the "re-resettlement" hearing on November 24 and 25, 1958, defendant, with consent of the superior court and the deputy district attorney, appeared before Judge Evans in propria persona; he had the services of a legal adviser of his choice.

Defendant called Judge Evans as a witness.[7] In answer to defendant's question, "Did your Honor ever check the corrections and changes you ordered made in Exhibit A to determine whether they actually could be made before making the order [of February 28, 1958]?" Judge Evans testified, "I did not check each and every item in Exhibit A. . . . I took the documents which were in evidence, referring to People's 2 [report of expert Lill listing proposed corrections in the transcript], and . . . defendant's Y [report of expert Hanna listing such corrections] . . . and first where there was any conflict

---

[5] For example, Exhibit A reads "[page] 49 [line] 9 For 'taking the recess' read 'going with the.' " This correction could not be made on page 49 because the words "taking the recess" do not appear on that page. Defendant in his supplementary opening brief points out that this ordered correction was "omitted . . . completely" and suggests that there may have been simply a typographical error in the page number, since the words "taking the recess" appear at page 48, line 9. (It may be noted, however, that the ordered substitution, if it had been made at page 48, would not make sense.)

[6] For example, Exhibit A states, "[page] 249 [line] 8 After 'A' insert 'come up.' " This correction was not made. The typist who prepared page 249 of the corrected transcript testified, "I questioned that. I took it up with Judge Evans and he said to leave it as in the original transcript, which is 'Stick them up.' . . . [I]t sounded like in the original transcript 'stick them up,' would be more natural after referring to having guns, and so forth, would sound more logical than 'come up.' " Defendant in his supplementary opening brief says that he "should have been allowed to determine if Judge Evans had directed that the ordered correction be ignored because of a typist's 'logic.' "

[7] Code Civ. Proc., § 1883: "The judge himself . . . may be called as a witness by either party; but in such case it is in the discretion of the court or judge to order the trial to be postponed or suspended, and to take place before another judge . . ."

as to any of the items set out in those exhibits, which conflict was developed during the hearing, then they were gone into and dovetailed with all of the other evidence . . . and the Court came up with what the Court deemed was the proper finding. Where there was no conflict . . . the Court took a good many of those without ever checking them . . . [W]e ran across a few typographical errors—that is, what we deemed typographical errors—in the exhibits and tried to properly correct them. That is, before the February 28th order. Whether we got all of them, I don't know.''

. The judge further testified that after the making of the February 28 order, when the typists called the 90 apparent errors in Exhibit A to his attention, "I did my best to go over them and determine whether they were typographical in my opinion, or what they were, and ordered the insertion at the place that I deemed proper under the situation. . . . [W]e attempted first to check the transcript to see if we could determine that there had been a typographical error and have the correction made as it should have been made. Where we couldn't determine that, of course, there was nothing else we could do than just order the change deleted.'' Defendant said that he would ask "specific questions dealing with specific changes, your Honor," but requested and was allowed to first take the testimony of the clerk.

Then Judge Evans said, concerning his further appearance as a witness, "I have no desire to hide or to try to hide anything that I have any knowledge of, but I am just afraid the thing might get out of hand and . . . I don't want to . . . be testifying. I don't think there is anything that is primarily within my mind that is not within anyone else's, except the fact, of course, these changes were made in what I assumed were typographical errors in citation and page and line numbers. . . . I think what we had better do is possibly have you [defendant] make a record on what you had in mind asking, and I will just make the record that I . . . refuse to testify.'' In further colloquy Judge Evans said, "I don't want to walk into a situation where I am testifying on the merits of the thing that I am going to have to decide. . . . [I]n order to avoid that possibility, I think at this point we had better terminate my appearance as a witness. . . . I don't know what questions are to come. I don't want to be faced with them and then decide.'' The judge suggested that defendant "make your record on the questions that you anticipated asking" and defendant suggested that this would be "futile in view of the

position taken by the Court that it is not going to answer any questions.''

The typists who had prepared the corrected transcript then testified that when they found corrections listed in Exhibit A which could not literally be made (i.e., where the ordered changes directed the alteration of a stated word at a stated page and line although such word did not appear there), or when the ordered changes appeared unintelligible, they called the matters to Judge Evans' attention and he gave them the instructions which resulted in the 90 changes.

The colloquy concerning the judge's dual role as court and witness resumed. Judge Evans persisted in his position that he had explained the ''mechanics'' of the 90 changes, that he would not answer any more questions, and that he had made that decision before he knew what the further questions might be. Defendant persisted in his refusal to make a record of the questions which he wished to put to the judge.

Judge Evans denied defendant's motion that the court suspend the proceedings and either ''ask for the assignment of another judge . . . in order that I may call Judge Evans . . . as a witness'' or ''permit me to go by some appropriate writ immediately to the California Supreme Court'' for a ruling as to whether Judge Evans had ''jurisdiction'' to refuse to testify further and to continue to preside at the ''re-resettlement.''

Defendant then declined to present any further evidence or argument. Over defendant's objection ''to all of the changes and also to the fact that the Court is proceeding now'' Judge Evans disallowed the objections to each of the 90 changes (except the 26 to which defendant stipulated) and ruled that each change should stand.

The People called defendant as a witness, directed his attention to Judge Evans' repeated suggestions that defendant make of record the questions which he had intended to ask the judge, and asked whether ''you refuse to file any such list of questions.'' Defendant replied, ''It is my position now that the Court is without jurisdiction.'' Further pressed for an answer defendant said, ''I do not choose to answer.''

Defendant by petition to this court for mandate and prohibition attacked the ''re-resettlement'' order of November 25, 1958. The petition was denied without opinion. (*Chessman v. Superior Court*, L.A. 25261.) On December 12, 1958, Judge Evans, in defendant's presence, again certified the corrected reporter's transcript of the trial. Defendant was re-

turned to San Quentin. This newly corrected reporter's transcript, certified on December 12, 1958, and the proceedings which produced it, are presently before us for review.

 *Defendant's Attack on the "Re-Resettlement" Proceeding.* Defendant urges that Judge Evans' refusal to testify further concerning the 90 changes in the some 2,000 changes ordered on February 28, 1958, denied defendant due process. But there was no occasion for Judge Evans to testify at all. When defendant, pursuant to our mandate (*Chessman* v. *Superior Court* (1958), *supra*, pp. 843-844 of 50 Cal.2d), was produced in court, the judge could merely have announced that he had theretofore informally decided (as he obviously must have decided before he certified the corrected reporter's transcript on May 1, 1958) that the February 28, 1958, order should be changed in 90 respects and that he proposed to order in open court that such February 28 order be corrected in accord with his previous informal determinations; and if defendant had any objections to any of the proposed 90 changes he could then present them and the judge could rule on them. Whether the 90 changes, or any of them, were judicial or clerical in character would in those circumstances be immaterial. The judge, acting as a judge, would have been simply correcting the records of the court and completing the settlement of the transcript in defendant's presence. (Such correction and settlement, of course, are ordinarily performed by the judge in chambers, without the presence of parties or counsel; it is only because of the peculiar circumstances of this case that defendant was present in open court; see pp. 841-842 [3, 4] of 50 Cal.2d.)

If defendant had any complaints that the correction of the February 28 order and the "re-resettlement" of the transcript were not supported by the evidence at the previous resettlement hearings, he could have presented those complaints. Since defendant was present in court, with opportunity to be heard, there was no occasion for the judge to undertake an explanation of whether his original, informal action as to the 90 changes was solely clerical or in part judicial, or of why and how the changes were made. Inasmuch as our mandate reopened the resettlement proceedings insofar as the making of the 90 changes was concerned, and inasmuch as the trial court had defendant before it and gave him full opportunity to object to those changes, whether judicial or clerical, there was no denial of due process.

 Whatever effect might otherwise be given to the fact

that Judge Evans assumed and then declined to continue in the role of witness is overcome by the further fact that defendant in turn refused to continue in the role of questioner or objector and sat silent (except for his general objection to the judge's proceeding to act) while Judge Evans ruled that each of the 90 changes should stand. Thus defendant in this respect deliberately declined to be heard and refused to make a record defining any error in the making of the 90 changes.

█ Even if there were no other basis for our conclusion as to this phase of defendant's arguments it would be impelled by this consideration: Because defendant in open court refused to show specifically the matters on which he now asserts that he wished to be heard as to the 90 changes, and because those changes, as is apparent from inspection of the reporter's transcript and the judge's findings, are in any event immaterial to the disposition of the cause on its merits, we cannot accept defendant's contention that Judge Evans' refusal to testify was either a denial of due process or prejudicial error.

Defendant further argues that he was prepared to show, at the *"re-resettlement"* hearing, that the whole of the reporter's transcript, and the whole of Mrs. Lill's evidence in support of it and suggested corrections of it, should have been rejected. But the matter was not then before Judge Evans for any such re-examination; it was at that time before him for a hearing as to the 90 changes only.

█ *Defendant's Attacks on the Resettlement Proceedings.* Defendant renews his argument that in a death penalty case any reporter's transcript prepared by a reporter who undertakes to read and transcribe the notes of a deceased reporter is improper. For the reasons stated in *People* v. *Chessman* (1950), *supra,* 35 Cal.2d 455, 459-462 [1-10], we hold that such method of preparing a record, although not in literal compliance with the Rules on Appeal, is proper where it results in the production of a fair transcript, adequate to review and resolution of the material issues. █ As defendant points out, we vacated a portion of the order of this court reported in the above cited 1950 opinion, and vacated the judgment in *People* v. *Chessman* (1951), *supra,* 38 Cal.2d 166. But this action on our part was taken, obedient to the decision in *Chessman* v. *Teets* (1957), *supra,* 354 U.S. 156, to enable defendant to appear at the resettlement proceedings in person or by counsel as he might choose; it does not mean, as defendant suggests, that we repudiated our conclusion that a completely fair and adequate transcript might properly be made.

The preparation of a transcript by a substitute reporter is not unprecedented; the evidence at the resettlement hearings discloses that in other cases one court reporter has transcribed another's shorthand notes. In fact, corroborative of the close professional association and *inter se* technical abilities of the two reporters here concerned, it appears that in 1945 Perry transcribed Fraser's notes of a two-week criminal trial had in 1932; Fraser thereafter examined the transcript which Perry had prepared and found it "very true and accurate."[8]

Defendant urges that this court has inherent power to order a new trial in appropriate circumstances where, without fault of appellant, no adequate record can be produced. With this last stated contention we have no quarrel. But Judge Evans found that an adequate record could be and had been produced and our review of the resettlement proceedings leads us, as hereinafter explained, to reject defendant's contention that this finding is not supported by the evidence.

It is true that the corrected reporter's transcript certified by Judge Evans does not include a transcription of many symbols which appear in Perry's notes and that it does include words added by Fraser (as presumably Perry would have done) to "smooth out" portions of Perry's notes that were, characteristically of the normal procedures of some, if not all, court reporters, "skeletonized." And not only are there conflicts in the expert evidence as to how some of the symbols should be read, but also there is a sharp difference of expert opinion as to whether the notes as a whole are sufficiently legible to permit any adequate transcription by anyone.

Concerning Judge Evans' resolution of the conflicting evidence we mention the following considerations of which we spoke in *People* v. *Chessman* (1950), *supra*, 35 Cal.2d 455, 461 [6]: It is to be expected that, at least ordinarily, a reporter can read his own notes better than those of another reporter, but this does not mean that in no case can one good reporter read and transcribe another's notes with substantial accuracy. Particularly is this true when the reporters are familiar with each other's work. The question is one of fact to be determined in each case in which it may arise. The minimum statutory requirements for court reporters (im-

[8]See *In re Byrnes* (1945), 26 Cal.2d 824, 828 [2] [161 P.2d 376] [in which this court determined that the defendant in the 1932 trial should be afforded opportunity to seek relief from default in perfecting his appeal]; *People* v. *Byrnes* (1949), 84 Cal.App.2d 72 [190 P.2d 290] [in which such appeal was heard and decided on the Perry transcript of Fraser's notes].

mediate transcription of matter dictated at the rate of 150 words a minute for five minutes; Gov. Code, § 69943) obviously do not insure that all or any official reporters can produce complete and entirely accurate transcriptions of all matter reported under courtroom conditions.

Strikingly apparent from the reporter's transcript of the resettlement proceedings (when all in the courtroom were very conscious of the questions of reporting) are the obvious facts that persons make mistakes in speaking, reporters make mistakes in hearing or inscribing, and typists make mistakes in transcribing.

It seems pertinent to mention also some simple facts, developed by the experts at the resettlement hearings, concerning the type of Pitman shorthand which Perry wrote. A given shorthand symbol, correctly written, does not represent one and only one word.[9] A given word or phrase can be correctly written in more than one way. Different reporters use different expedients and contractions. Reporters making notes under courtroom conditions do not write "copybook" shorthand.

No useful purpose would be served by setting forth particular conflicts in the evidence of the shorthand experts and the other witnesses which, defendant argues, should cause the reviewing court to conclude that Judge Evans should have resolved those conflicts in defendant's favor. We quote in Appendix I, *post*, p. 501, at some length from the judge's written order of February 28, 1958, which shows that he considered the conflicting evidence and went through a normal fact-finding procedure.

Defendant urges that Judge Evans should have appointed an "independent," "impartial" shorthand expert on defendant's motions of December 20, 1957 (in the middle of the resettlement hearings), and February 13, 1958 (almost at the end of the resettlement hearings). It does not appear that such appointment would have accomplished anything but further prolongation of the hearing. Except for Mr. Fraser, who naturally might have had a motive to defend his own work, the experts who testified were "independent." Each of the experts, having expressed an opinion, naturally was dis-

---

[9] E.g., Mrs. Kalin, illustrating, wrote a symbol which represents "pawn," "pin," "pine," "upon," "pain," "pane," "pen," "pun," "open," "punish," or "happen" and which "By closing this little 'n' hook" represents "pawns," "pins," "pines," "pin his," "pin us," "pawn his," "pawn us," "pence," "pains," "opens," "pounce," "punishes," "punishment," "punish his," "punish us."

posed to defend it. Their differences of opinion were only such differences as are often developed by witnesses, expert or lay, as to any disputed question of fact. The objectivity and weight of their reasons for their opinions, of course, were for the trial judge.

. After our own review of both the original record and the resettled record, together with the record of the resettlement and "re-resettlement" proceedings, we find amply supported, and we accept, Judge Evans' findings that "the shorthand notes of Mr. Perry were decipherable and that Mr. Frazier [sic] was competent and qualified to transcribe and did so transcribe those notes fairly and in a substantially accurate manner. . . . Mr. Perry's notes could be and were transcribed with substantial accuracy. . . . As regards the claim by the defendant that during the time the jury was deliberating and when they returned to the courtroom for further instructions Judge Fricke instructed them that the defendant was one of the worst criminals he had had in his court, and that the jury should bring in the death penalty, this is purely a figment of the defendant's imagination which was conceived several years after the time of his trial, and it is the opinion of this Court that many of the other claimed omissions and errors are of a similar nature.[10] . . . While the changes to be made as listed in Exhibit 'A' attached hereto are many in number, a study of these changes makes it very clear that, considering them either individually or collectively, they in no way change the substance and nature of either the People's

---

[10]Note the similarity to the findings of the federal district judge, after adversary hearing, in *Chessman* v. *Teets* (1956), 138 F.Supp. 761, 765-766:

"Deputy District Attorney Leavy did not engage in any fraudulent or unlawful conduct in the preparation of the transcript . . . Shorthand reporter Perry was not unable to properly record the trial proceedings . . . Fraser was exceptionally and specially competent to transcribe Perry's notes and did so with fairness and competently. . . . Leavy made no misrepresentations of any kind to the trial judge as to the accuracy or correctness of the transcript as prepared by Fraser. . . .

"The instructions given by the trial judge to the jury on May 21, 1948 were correctly and accurately reported in the transcript as prepared by Fraser. . . . The allegation . . . that the trial judge stated to the jury on May 21, when instructing them, that 'this defendant is one of the wors[t] criminals I have had in my court' is false and perjurious. . . .

"It is not true that the transcript prepared by Fraser had been materially or otherwise altered through the connivance of said Fraser and Leavy . . . [N]ot only Fraser and Leavy, but the trial judge as well, endeavored to and did arrange for and completed the transcript in Chessman's case in the best of good faith and with diligence and fairness, so that a fair and correct record could be provided the Supreme Court of California upon Chessman's automatic appeal to that court."

case or the defendant's defense.'' We conclude also
that the corrected reporter's transcript is substantially ac-
curate and sufficiently complete in every respect to permit a
fair review of the appeal from the judgments of conviction,
and we reject defendant's arguments that our acceptance of
such transcript denies him constitutional rights.

 Defendant renews his attack, rejected in *Chessman* v.
*Superior Court* (1958), *supra,* 50 Cal.2d 835, 840-841, on the
minute order of March 13, 1958, which without notice *nunc
pro tunc* amended the November 27, 1957, minute order to
appoint Mr. Fraser under Code of Civil Procedure, section
1871, to testify as a shorthand expert. As we there pointed
out, defendant and his counsel during the resettlement pro-
ceedings expressly recognized the obvious fact that Fraser
''has been brought by the State as an expert''; ''the People
have offered Mr. Fraser as . . . an expert in transcribing short-
hand notes, especially Mr. Perry's notes.'' Defendant and
his counsel sought to show that Fraser was not qualified for
that role. As we further pointed out, the appointment which
enabled the court to compensate Fraser as a court-appointed
expert did not retrospectively bestow expertise on him. We
again hold that defendant cannot complain of the *nunc pro
tunc* order which does not affect him.

We now turn to a consideration of defendant's arguments
that the judgments of conviction cannot stand because of
claimed prejudicial errors and denials of constitutional rights
in the proceedings which resulted in such judgments.

 *Denial of Defendant's Motion for Continuance and
Application for Foreign Subpoenas on April 29, 1948.* On
April 29, 1948, defendant appeared in propria persona for
trial before Judge Fricke and moved for a continuance on the
ground, among others, that he had been denied opportunity
for effective preparation because his jailers applied to him
the jail rules applicable to prisoners and would not give him
the freedoms of an attorney. He stated, ''I wish to point out
that it is my intention to act in propria persona at this time
and to continue to do so until such time as it is legally estab-
lished that I am not qualified to do so, and that I will not
accept a court-appointed attorney.'' Defendant filed his
affidavit in support of an application for subpoenas addressed
to witnesses who resided out of the county and for subpoena
duces tecum. Judge Fricke denied a continuance and the
application for subpoenas. The judge urged defendant to
accept the services of Mr. Al Matthews, deputy public de-

fender, as counsel or legal adviser, or to obtain counsel or an adviser of his own choosing. Defendant said that he wanted and had been unable to obtain an adviser of his own choice. On April 30, 1948, before selection of the jury began, defendant requested and received appointment of Mr. Matthews as legal adviser.[11]

Defendant now renews and elaborates his attacks on the denial of the application for subpoenas and of a continuance. The pertinent facts[12] and the applicable law as to those rul-

[11]We have since ruled that due process does not require that any defendant be furnished with counsel to act as a mere "legal adviser" or in any subservient capacity. (*People* v. *Mattson* (1959), 51 Cal.2d 777, 793-794 [14-17] [336 P.2d 937].)

[12]The following facts are today, as they were in 1949, when the original transcripts were filed in this court, of undisputed record:

After the filing of the original informations on February 18, 1948, defendant, represented by Morris Lavine, a private attorney, appeared on February 20, 1948. On March 5 and 6, 1948, defendant, represented by V. L. Ferguson, a private attorney, appeared; on the latter date Mr. Ferguson was relieved.

On March 12, 1948, defendant appeared before the master calendar judge for plea. The public defender stated that he had been relieved. Defendant insisted upon representing himself, although the judge strongly advised him against this course. He pleaded not guilty. Both before and after the pleas the judge explicitly and repeatedly told defendant that he must be prepared for trial on the date set and could not expect a continuance on the ground that he or any attorney who might appear for him was not prepared. Defendant waived statutory time for trial. Trial was set for April 26, 1948, on informations which accused both defendant and David Knowles (of *People* v. *Knowles* (1950), *supra*, 35 Cal.2d 175), and for April 29 on an information against defendant alone.

"Some time during the middle of March" Deputy Public Defender Al Matthews visited defendant and offered to represent him. Defendant refused his services.

On April 26, 1948, defendant appeared in propria persona for trial on the informations which accused both him and Knowles. On defendant's motion his cause was severed from that of Knowles and continued to April 29, 1948.

Also on April 26, 1948, defendant delivered to a deputy sheriff a list of the names and addresses of 20 witnesses whom he wished subpoenaed. Two of these witnesses (an official of Folsom State Prison and the chairman of the Adult Authority) resided outside Los Angeles County. On the list appeared a note that the Department of Corrections "Case record of #66565-A CHESSMAN" was "to be produced in court" by the Folsom officer "and to be submitted as evidence by the defense."

With defendant's permission the deputy sheriff delivered the list to Mr. Leavy. Mr. Leavy at once wrote to defendant that the subpoenas for local witnesses would be prepared and delivered to the sheriff for service (and this was done); that to obtain foreign subpoenas defendant must show by affidavit or under oath in court "the necessity of such witnesses as well as the materiality of the testimony."

The affidavit for foreign subpoenas and subpoena duces tecum filed by defendant when he appeared for trial on April 29, 1948, showed a legal theory which defendant proposed to advance; i.e., that he did not commit the alleged sex offenses because he did not have the disposition

ings of Judge Fricke are the same as they were when we considered the matter from another point of view in *People* v. *Chessman* (1950), *supra,* 35 Cal.2d 455, 465 [14], and when we decided *People* v. *Chessman* (1951), *supra,* 38 Cal.2d 166, 174 [1, 2]. The trial judge's ruling were correct.

We note also that defendant relies on the following evidence developed at the resettlement proceeding to show that Judge Fricke's denial of a continuance on April 29, 1948, deprived him of counsel of his choice: Mr. William Roy Ives, an attorney, visited defendant in jail during the latter part of March and the months of April, May, and June, 1948. Defendant wished to employ Ives but Ives would not actively associate himself with the case until arrangements for his fee were made. When, before trial, it became apparent that defendant could not arrange for the fee in time to enable Ives to hire an investigator and prepare, Ives asked Leavy to consent to a request for a continuance. Leavy refused. At about this time Ives represented defendant in a collateral proceeding concerning one of his prior convictions. Defendant testified at the resettlement proceedings that Mr. Ives was in court on April 29, 1948, when a continuance was denied. The foregoing evidence does not change the situation. Defendant was entitled to and was afforded opportunity to have counsel but he was not entitled to the services of a particular attorney. (See *People* v. *Manchetti* (1946), 29 Cal.2d 452, 458 [175 P.2d 533].)

*Consolidation of Counts, Requirement that Defendant Remain at Counsel Table, Denial of Defendant's Motion for Daily Transcript, Refusal to Permit Both Defendant and Mr. Matthews to Argue.* The corrected reporter's transcript and the testimony at the resettlement proceedings do not materially change the picture of Judge Fricke's rulings as to the foregoing matters which was presented in *People* v. *Chessman* (1951), *supra,* 38 Cal.2d 166, 175 [3], 176-177 [5, 6], 188 [28,

---

to commit such offenses (see *People* v. *Jones* (1954), 42 Cal.2d 219, 223-225 [5-11] [266 P.2d 38]). But it also showed that defendant proposed to prove this, not by admissible expert psychiatric testimony or by evidence of reputation for lack of sexual abnormality in a heterosexual ''community,'' but by testimony of penological officials who had known defendant in prison and by hearsay documents. We are not impressed by defendant's arguments that he had no opportunity to obtain and present in proper fashion the asserted evidence of his lack of disposition to commit sex crimes. In this connection we observe that from April 30 through the trial defendant had the services of Mr. Matthews and an investigator employed by the public defender.

29]. Having reconsidered our then holdings, we reiterate them.

Concerning the consolidation of counts we further observe that the ruling thereon, even if the record showed an express objection of defendant thereto, would be within the discretion of the trial court. Section 954 of the Penal Code (as it read at the time of trial) provided that "An indictment . . . may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes . . . , under separate counts, and if two or more indict- ments . . . are filed in such cases the court may order them to be consolidated. . . ." The automobile stolen in crime (2) was used in the perpetration of crimes (3) through (13). Crimes (3) through (13) were committed in similar fashion (i.e., by use of an automobile spotlight and a pistol to affright persons in isolated areas at night). The store robberies and related kidnapings ((1) and (14) through (17)) were of the same "class" of crimes as the "spotlight" robberies and kidnapings.

It appears that the situation here comes within the holdings of cases which permit joinder of offenses, even though they do not relate to the same transaction and were committed at different times and places and against different victims, where there is a common element of substantial importance in their commission. (See *In re Pearson* (1947), 30 Cal.2d 871, 873-874 [1, 2] [186 P.2d 401]; *People* v. *Scott* (1944), 24 Cal.2d 774, 778 [5] [151 P.2d 517]; *People* v. *Duane* (1942), 21 Cal.2d 71, 76-78 [130 P.2d 123]; *People* v. *Kelly* (1928), 203 Cal. 128, 133-135 [263 P. 226].) Here the element of intent to feloniously obtain property runs like a single thread through the various offenses, and we cannot see how defendant was prejudiced by joinder of the simple rob- beries and robbery-kidnapings with the revolting crimes in which sex offenses were connected with robbery.

*Self Incriminating Statements of Defendant to the Police Concerning the Crimes Charged.* The reporter's transcript settled by Judge Evans reflects, as did the reporter's tran- script settled by Judge Fricke, a conflict in the testimony and the inferences which could be drawn from it as to whether the incriminating statements were, as defendant testified, false and the product of force, fear, and improper inducement. Defendant's arguments concerning the effect of this evidence and asserted prejudicial errors in the instructions as to con- fessions which substantially reiterate the contentions con-

sidered in *People* v. *Chessman* (1951), *supra,* 38 Cal.2d 166, 178-182 [8-12], are rejected for the reasons there stated. We particularly repeat that instructions concerning a false confession such as the italicized portion of the instruction quoted at page 180 [9] of 38 Cal.2d can be dangerously misleading but (as explained on pages 180-181 of 38 Cal.2d) that the giving of the instruction, upon the facts of this case, was not prejudicial error. Our conclusion in this regard is not changed by the circumstances that defendant's present arguments, unlike his arguments in 38 Cal.2d, direct attention to differences (referred to by the prosecuting attorney and in remarks and instructions of the trial judge) between a confession and an admission, differences which are often subtle and questionable (see cases cited in *People* v. *Linden* (1959), *ante,* pp. 1, 29, footnote 8 [338 P.2d 397]).

Evidence of the incriminating statements was introduced not as part of the People's case in chief but as impeachment of defendant's testimony and as rebuttal. Defendant now complains of this order of proof, although he did not object to it at the trial or in his original briefs on appeal on the merits. Although appellate courts have properly condemned prosecuting attorneys for withholding part of the case in chief and offering it after the defense closed, we cannot see how defendant was prejudiced by the order of proof here. The prosecuting attorney on cross-examination asked defendant whether he had made a certain incriminating statement. Before the People were allowed to continue with this line of inquiry, they were required to lay a foundation that any statements of defendant to the police were voluntary, and defendant introduced evidence to the contrary. It does not appear that defendant was surprised or hindered in his defense by ensuing police testimony concerning his self incriminating statements. (See *People* v. *Avery* (1950), 35 Cal.2d 487, 491 [1, 2] [218 P.2d 527].) And defendant is mistaken in his contention that because the evidence of such statements was introduced after he had taken the stand it could be considered only to impeach defendant, not as proof of the People's case.

*Misconduct of the Prosecuting Attorney not Controlled by the Trial Judge.* In *People* v. *Chessman* (1951), *supra,* 38 Cal.2d 166, 177-178 [7], this court summarized the most serious improprieties of the prosecuting attorney and pointed out that they might have been corrected if defendant

had not deliberately failed to interpose objections. Also, some matters of which defendant complains were interjected into the trial by defendant himself.[13] As to our former con-

[13]Defendant, beginning the voir dire examination of prospective jurors, repeatedly asked such questions as the following: ''Do you have any prejudice against an individual defendant himself in court rather than securing an attorney?'' ''Do you think that criminality is a form of insanity?'' ''Do you feel that a person with superior intelligence is more apt to be mentally unstable or criminally inclined?'' He complains that thereafter the prosecutor on voir dire said that defendant ''asked some questions with reference to, 'Do you think criminals are insane?' I could not anticipate what the evidence will show here . . . but . . . on a trial under a plea of Not Guilty, which is the only one the defendant here has entered, . . . you might think he is just as insane as some people for the defense say; but you have got to find him Guilty if you think he is guilty beyond a reasonable doubt even though you think that at the time of the crime in your humble belief he was insane.'' Defendant also complains that the prosecutor repeatedly referred to defendant's appearing for himself as ''a good advantage to grab some sympathy,'' and in argument said, ''He is not only depraved and vicious, but he is also clever. . . . I personally feel I am at a disadvantage trying this case with him representing himself.''

On direct examination defendant (replying to questions asked by his legal adviser) testified as follows:

''Q. By MR. MATTHEWS: You have robbed people in the past, have you not? A. That is correct.

''Q. You have been a thief most of your life, have you not? A. I have been a thief most of my life.''

Mr. Leavy commenced his cross-examination of defendant by asking, ''How much money did you have on you at the time of your arrest?'' (About $265 had been stolen some two hours before in the crimes above numbered (14) through (17).) Defendant replied that he had $150 and, in answer to further questions, testified that he had obtained the money by working for his father. Pressed further as to the source of his funds defendant testified that he obtained some money ''From a bookie''; that he had not bet with the bookie but ''we just had occasion to walk into his establishment and I told him that he had lost on a particular horse'' and ''he gave us $2300.'' Mr. Matthews then objected to further questions on this line on the ground that defendant might incriminate himself. Judge Fricke overruled the objection on the ground that ''You opened the door.'' Defendant explained that the bookie ''lost because I had a pistol in my hand.''

Note that the situation is not the usual one where the ''open the gates'' argument is invoked because defendant has made over-extensive protestations of his goodness (see *People* v. *Wells* (1949), 33 Cal.2d 330, 340 [6] [202 P.2d 53]); rather, defendant here frankly testified on direct examination that he was a robber and a thief and the People then proceeded to introduce evidence of specific instances of his banditry and criminality.

Similarly the testimony of police officers concerning defendant's extrajudicial admissions of his gun fights with the authorities in years prior to the crimes for which he was on trial was not improper impeachment to show that defendant had testified falsely as to matters which could not be proved independently in the case (see *People* v. *Wells, supra,* p. 340 [7] of 33 Cal.2d), but rather confirmed testimony which defendant had volunteered, not in answer to specific questions, on cross-examination in connection with the laying of the foundation as to whether the officers had improperly coerced or induced him to make admissions.

clusion that defendant, having thus developed the record, cannot claim prejudice from it, defendant now asks why he should have "cunningly invited his own doom" and how he could have been responsible for the prosecutor's improper methods and the trial judge's failure to protect defendant. From examination of the record, the answer seems clear: defendant chose a technique (which, regrettably, in some cases has been chosen by experienced attorneys) of presenting a defense in manner and substance which conceivably might favorably impress the jury by its boldness and at the same time anticipated possible rejection of the defense and therefore sought to build up an atmosphere and incite the prosecutor to conduct which might lead to a holding of reversible error.

*Instructions that One Sentenced to Life Imprisonment without Possibility of Parole Might be Released by Pardon or Retrospective Change in the Law.* We recognize that there is authority contrary to such decisions as *People v. Turville* (1959), 51 Cal.2d 620, 633 [10] [335 P.2d 678] ; *People v. Friend* (1957), 47 Cal.2d 749, 754-755, 764 [306 P.2d 463] ; *People v. Chessman* (1951), *supra*, 38 Cal.2d 166, 189 [30] ; and *People v. Osborn* (1951), 37 Cal.2d 380, 384-385 [231 P.2d 850], which hold that the jury can be informed of the possible effect of executive or legislative action on a sentence to life imprisonment without possibility of parole, or of such action or parole upon a sentence to life imprisonment. (*Jones v. Commonwealth* (1952), 194 Va. 273 [72 S.E.2d 693, 35 A.L.R.2d 761] ; annotation, 35 A.L.R.2d 769 ; *State v. White* (1958), 27 N.J. 158 [142 A.2d 65, 71-76 [10, 1]] [the majority, concurring, and dissenting opinions discuss the policy reasons for and against informing a jury as to the possibility of a life-term prisoner's being paroled; the majority concludes that a jury which inquires about the matter should be informed as to the law concerning parole and further instructed that they must exclude the subject of parole from their deliberations].)

We adhere to the view that the jury have the right to know the actual possible effect of their determination as to punishment.

*Double Punishment.* In *People v. Chessman* (1951), *supra*, 38 Cal.2d 166, 193 [33-35], we accepted defendant's contention that he could not be punished both for kidnaping the female victims for robbery with infliction of bodily harm (the two crimes for which the death sentence was imposed)

and for the sex offenses which formed the basis of the findings of bodily harm. (See Pen. Code, § 654.) Defendant now contends that the proper disposition of this double punishment problem is to strike the findings of bodily harm from the two death sentence verdicts; that "The two sentences of death are accordingly void" but that (if the court rejects defendant's other attacks on the judgments) it could affirm both the sex crime convictions and the two kidnaping convictions (presumably with imposition of life sentences). This argument is devoid of merit. Penal Code, section 654, specifically proscribes double punishments rather than double convictions. A single act constituting an essential element of two separately charged crimes may result in initial conviction of both crimes but only one—the more serious offense—will be punished. (*People* v. *Knowles* (1950), *supra*, 35 Cal.2d 175, 187, 189; *People* v. *Logan* (1953), 41 Cal.2d 279, 290-291 [11, 12] [260 P.2d 20].) Where the more serious offense carries the death penalty no useful purpose would be served by reversal of the conviction for the less serious offense.

*Defendant's Contentions as to Section 209 of the Penal Code.* By section 209 as it read at the time the charged offenses were committed, and at the time of trial,[14] the Legislature defined and made punishable as kidnaping any detention incident to robbery or attempted robbery. (*People* v. *Knowles* (1950), *supra*, 35 Cal.2d 175, 180 [3], 181 [6].) The prosecutor so argued[15] and the jury were so instructed.[16] ▆▆▆ Since the 1951 amendment of section 209,[17] kid-

---

[14]Stats. 1933, p. 2617: "Every person who seizes, confines . . . or who holds or detains [another person] . . . to commit . . . robbery . . . is guilty of a felony and upon conviction thereof shall suffer death or . . . imprisonment in the state prison for life without possibility of parole, at the discretion of the jury trying the same, in cases in which the person . . . subjected to such kidnaping suffers . . . bodily harm or . . . imprisonment in the state prison for life with possibility of parole in cases where such person . . . do[es] not suffer bodily harm."

[15]E.g., concerning offense (7), "that is kidnapping for the purpose of robbery, when he seized that woman, even before he moved her."

[16]E.g., "the Kidnapping is complete once the individual is seized for the purpose of robbery."

[17]Stats. 1951, ch. 1749: "Any person . . . who kidnaps or carries away any individual to commit robbery . . . shall suffer death or shall be punished by imprisonment in the state prison for life without possibility of parole, at the discretion of the jury trying the same, in cases in which the person . . . subjected to such kidnaping suffers . . . bodily harm.

"Any person serving a sentence of imprisonment for life without possibility of parole following a conviction under this section as it read prior to the effective date of this act shall be eligible for a release on parole as if he had been sentenced to imprisonment for life with possibility of parole."

naping for the purpose of robbery requires some asportation of the victim, although not for any particular distance. (*People* v. *Chessman* (1951), *supra*, 38 Cal.2d 166, 192 [32].) In the last cited case we assumed (p. 191 [31a] of 38 Cal.2d) that one sentenced to death for conduct amounting to no more than robbery with infliction of bodily harm before the 1951 amendment should not be so punished after the amendment's effective date.

Defendant now repeats his argument (summarized at p. 186 of 38 Cal.2d) that the evidence as to the two death penalty counts "at the most shows that he first robbed Regina and attempted to rob Mary, then abandoned his intent to rob and abducted the women with the sole intention of committing sex crimes against them." We there said that such argument might be addressed to the trier of fact but could not be sustained as a matter of law. But, defendant says, since the jury were instructed that the kidnaping is complete once the victim is seized for the purpose of robbery, they may well have returned the death penalties even though they believed that defendant abandoned his initial intent to rob after he had merely detained the female victims, and then formed the intent to and did move them for another purpose. We do not believe that the verdicts are susceptible of such fragmentation. The verdict as to each death penalty count reads, "We . . . find the Defendant guilty of KIDNAPPING FOR THE PURPOSE OF ROBBERY, a felony, *as charged* . . . and find that the person named suffered bodily harm and fix the punishment at death." (Italics added.) The offense charged in each of the two counts was "KIDNAPPING FOR THE PURPOSE OF ROBBERY, a felony, committed as follows: That the said CARYL CHESSMAN . . . did willfully, unlawfully and feloniously seize, confine, abduct, conceal, *kidnap and carry away* [the female victim] . . . with the intent to hold and detain, and . . . did hold and detain said [victim] . . ., with intent, and for the purpose of committing robbery." (Italics added.) It does not appear that these verdicts and the incorporated charges can reasonably be understood to amount to findings that defendant first kidnaped his female victims by mere detention for the purpose of robbery, then abandoned his intent to rob, then carried away the victims, and then inflicted bodily harm upon them by the commission of sex offenses. Rather, it appears, the jury must have viewed the series of criminal acts as continuous indivisible transactions and the various criminal intents

498

as existing and continuing simultaneously. The similar pattern of each crime tends to establish the intent and plan in perpetrating the other.

Any doubt as to the actual findings of the jury and as to possible prejudice to defendant is dispelled by the undisputed evidence in this regard. As we pointed out in *People* v. *Chessman* (1951), *supra,* pp. 185-187, 192 of 38 Cal.2d, as to each of the two counts which resulted in the death penalty, the bandit displayed a pistol and addressed the words "This is a stick-up" to his victims, then transported the female victim away from her chosen escort by threat of force (Mary for a considerable distance in the bandit's car, Regina from the car of her escort some 22 feet to the bandit's car), then inflicted bodily harm upon the woman; i.e., the expressed intent to rob, the asportation of the woman, and the infliction of bodily harm upon her, on the uncontroverted facts, constituted one continuing transaction. In view of such evidence, the following provision of the California Constitution (art. VI, § 4½) controls: "No judgment shall be set aside, or new trial granted, in any case, on the ground of misdirection of the jury [note that the instructions as to kidnaping were not "misdirection" at the time they were given], . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

Defendant further attacks the discussion and the holdings as to section 209 in *People* v. *Wein* (1958), 50 Cal.2d 383 [326 P.2d 457]; *People* v. *Chessman* (1951), *supra,* 38 Cal.2d 166; and *People* v. *Knowles* (1950), *supra,* 35 Cal.2d 175, as erroneous and unconstitutional. The substance of his arguments is presented in the dissenting opinions in the Knowles and Wein cases. Defendant's present elaborations of such arguments do not persuade us to overrule those cases.

*The Lengthy Confinement of Defendant under the Death Sentences.* As required by specific statutory provision (Pen. Code, §§ 1202a, 3600[1]) defendant has been held in San Quentin prison since the imposition of the death sentences (except on the occasions when, in compliance with the decision of the United States Supreme Court of *Chessman* v. *Teets* (1957), *supra,* 354 U.S. 156, and the implementing orders of the United States district court, of this court and

---

[1]See footnote 1, *ante,* p. 477.

of the superior court, he has been removed for court appearances). It is, of course, in fact unusual that a man should be detained for more than 11 years pending execution of sentence of death and we have no doubt that mental suffering attends such detention. Defendant argues that this confinement is unconstitutionally cruel and unusual punishment "inflicted . . . as a consequence of the California judiciary's unconstitutional actions and . . . as a penalty for appellant's demands that his constitutional rights be respected" and that he "is entitled to be discharged from custody forthwith because California has willfully failed to take, within a reasonable time, further proceedings not inconsistent with the opinion of the Supreme Court of the United States in *Chessman* v. *Teets* (1957), 354 U.S. 156 [77 S.Ct. 1127, 1 L.Ed. 2d 1253]."

We do not understand that the decision in *Chessman* v. *Teets, supra,* suggests that California had not acted with reasonable diligence in the prosecution of defendant up to that time. Indeed, the decision, which imposed on California certain incidents of procedure which had not theretofore been regarded by California as requirements of due process, remanded the case to the district court "with instructions to enter such orders as may be appropriate to allow California a reasonable time within which to take further proceedings not inconsistent with this opinion." Pursuant to such remand the federal district court on August 14, 1957, made its order which "allows California until December 1, 1957 to commence the proceedings for settlement of the trial transcript," and this court on August 29, 1957, remanded the cause to the superior court "for further proceedings not inconsistent with the opinion of the United States Supreme Court in *Chessman* v. *Teets* (June 10, 1957), 354 U.S. 156 [77 S.Ct. 1127, 1 L.Ed.2d 1253]." The proceedings which followed and the dates thereof are detailed, *ante,* pp. 478-480, and in the chronology (Appendix II) which is subjoined to this opinion, and we do not believe that those proceedings have involved unreasonable delay by California. We further conclude that under the circumstances of this case neither in the proceedings before, nor in those following, the remand by the high federal court, has California imposed unconstitutionally cruel or unusual punishment on defendant.

At no time in any proceeding during the entire history of this case has California denied this defendant the right to counsel (see Appendix II, *post,* p. 503), nor has he at any

stage of the California proceedings (unless at the attempted correction by Judge Evans of the 90 typographical or clerical errors in relation to the resettlement order, which were subsequently corrected in the presence of defendant attended by the legal adviser of his choice) been without the services of counsel except by reason of his own obdurate refusal to permit counsel to represent him.

 *Qualification of Justices of This Court.* Defendant asserts that the justices of this court are "jurisdictionally foreclosed" from deciding this (or any other) case because they have not complied with the provision of section 1060 of the Government Code that they "shall reside at and keep their offices in the City of Sacramento." The state Constitution (art. VI, § 23) provides that "No person shall be eligible to the office of a Justice of the Supreme Court, or of a district court of appeal, or of a judge of a superior court, or of a municipal court, unless he shall have been admitted to practice before the Supreme Court of the State for a period of at least five years immediately preceding his election or appointment to such office . . ." This constitutional requirement is generally regarded as exclusive and legislative attempts to add qualifications have been held unconstitutional. (*Wallace* v. *Superior Court* (1956), 141 Cal. App.2d 771, 774-782 [2-4] [298 P.2d 69] ; *Chambers* v. *Terry* (1940), 40 Cal.App.2d 153, 154-156 [1] [104 P.2d 663].) When a candidate for justice meets the requirement of section 23 of article VI and, after election or appointment, qualifies by taking the oath provided by section 3 of article XX, the Legislature cannot properly require, by way of additional qualification, anything (such as change of residence) which has no reasonable relation to the performance of his duties.

For the reasons above stated, the judgments and order appealed from are affirmed.

Gibson, C. J., Shenk, J., Traynor, J., Spence, J., McComb, J., and Peters, J., concurred.

Appellant's petition for a rehearing was denied August 5, 1959.

## APPENDIX I

### FINDINGS OF JUDGE EVANS IN FEBRUARY 28, 1958, ORDER OF RESETTLEMENT

"Every shorthand reporter who took the stand in this hearing was able to read at least a portion of those [Perry] notes and the demonstration on the blackboard by Mrs. Kalin, in the opinion of the Court, corroborated the fact that Mr. Perry's notes could be and were transcribed with substantial accuracy.

"Contrary to the claims of the defendant and the testimony of Mrs. Kalin, it is the opinion of this writer that the 'perfect' symbols placed upon the blackboard during her testimony were substantially similar in the vast majority of instances to the symbols in Mr. Perry's notes—the only difference being that Mrs. Kalin was drawing 'perfect' symbols, taking ample time, while Mr. Perry's notes were written at courtroom speed.

"Regarding Mr. Hanna's findings and his testimony, the Court concedes that he certainly had the finest of qualifications to appear as an expert in this case. However, it was obvious that Mr. Hanna either did not have sufficient time to study Mr. Perry's notes or he did not approach his job as objectively as he professed from the witness stand. . . . This Court is of the opinion that had Mr. Hanna had the time to study Mr. Perry's notes, together with that part of the transcript dictated by Mr. Perry, before he began checking Mr. Frazier's [sic] work, he too would have satisfied himself that the transcript was properly prepared. On the other hand, if he approached his task from the standpoint of an elementary instructor in shorthand to try to find what he could claim as errors or omissions made by Mr. Frazier [sic], his services are of little aid to the Court,—particularly when he claims to be a verbatim reporter and then says that no reporter's notes are perfectly accurate. [Mr. Hanna was asked, on cross-examination by the People, "As you examined these notes, were you looking for copybook shorthand?" and replied, "Absolutely not. . . . Why, copybook shorthand is next to impossible in reporting, unless the going is very slow. There is always some departure from the copybook outlines."]

"Concerning the charges or insinuations of the defendant that the transcript herein was fraudulently prepared, this Court has combed the record and has failed to find anything upon which the defendant could base such a claim. . . . The notes of the deceased reporter were examined by several reporters and after they had expressed opinions that the notes could be transcribed, and after other reporters had been asked if they would undertake the job, and had refused, and upon the suggestion of another disinterested court reporter, Mr. Frazier [sic] was contacted and agreed to do the transcription. His relationship to Mr. Leavy's wife certainly had no part in his having been so employed. In this respect it is interesting to note that prior to October, 1948, and before anyone interested in the defense of the defendant knew the facts surrounding the employment of a transcriber, and before the transcription had been completed, the defendant was advised that his legal adviser was 'elated' that a relative of Mr. Leavy was going to do the transcribing. Certainly, at that time the defense would not have been 'elated' that a transcript could and would be made, and the only logical conclusion is that upon receipt of this information it was then and there that the defendant's claim of fraud, to be pressed at a later date, was conceived.

"Considerable time was consumed during this hearing by the defendant in an attempt to show bias and prejudice on the part of Judge Fricke and Mr. Leavy. The record is completely void of any evidence to show that Judge Fricke had any feeling of bias or prejudice against the defendant prior to or during the trial of his case. At the time Judge

Fricke ruled on defendant's motion for a new trial, and when he pronounced judgment upon the defendant, it is a certainty that he then believed that the evidence produced during the trial was sufficient to justify the jury's verdict or he would have granted the defendant a new trial. His public expressions of his belief in the defendant's guilt came after he had completed the defendant's case and after he had heard the evidence for and against the defendant, and indicated only that he was exercising the right to state his opinion just as any other person might do.

"As regards Mr. Leavy, this Court is at a loss as to the reason for questioning him relative to his belief, prior to the time of trial, that the defendant was guilty. In the opinion of this Court, a district attorney who prosecuted a man whom he did not believe was guilty prior to the commencement of such prosecution would verge very closely upon a violation of his oath of office.

"As regards the claim by the defendant that during the time the jury was deliberating and when they returned to the courtroom for further instructions Judge Fricke instructed them that the defendant was one of the worst criminals he had had in his court, and that the jury should bring in the death penalty, this is purely a figment of the defendant's imagination which was conceived several years after the time of his trial, and it is the opinion of this Court that many of the other claimed omissions and errors are of a similar nature.

"Most of the defendant's claims of fraud and of bias and prejudice can be attributed to the fact that at all times during, and for some time after his trial, he refused to be represented by counsel and he could never be made to understand that as a prisoner first charged with, and then convicted of, very serious crimes, he was not and could not be accorded the same freedom of movement and the same access to conveniences that would be accorded an attorney representing a defendant, or a deputy district attorney.

"As to the claimed inability of Mr. Frazier [sic] due to his use of intoxicants, everyone will concede that he has at times, over quite a number of years, been in trouble due to his drinking. However, after observing him on the witness stand over a period of ten days, and considering all of the evidence at this hearing, this Court concludes that his work on this transcript was not affected in any way by his use of alcohol. He testified that he had not had a drink for a considerable period of time prior to commencing work on the transcript on appeal, nor did he take a drink during the time he was doing this work. The only real evidence that this testimony is in conflict with, is that of the two witnesses, who operated a liquor store in the vicinity of Mr. Frazier's [sic] home. In this respect, it is interesting to note that the gist of the testimony of these two women was that Mr. Frazier [sic] was intoxicated 97% of the time they knew him: that they sold him from one to five pints of liquor a day, but that they never sold him liquor when he was intoxicated. This type of evidence speaks for itself and no further comment is necessary.

"It is also of interest that throughout this entire hearing the only opinions expressed upon the ability of both Mr. Frazier [sic] and Mr. Perry were that they were both excellent court reporters. The fact that Mr. Frazier [sic] was arrested once during the time he was preparing the transcript in augmentation of the record on appeal in no way changes the conclusion heretofore mentioned.

"While the changes to be made as listed in Exhibit 'A' attached hereto are many in number, a study of these changes makes it very clear that, considering them either individually or collectively, they in no way change the substance and nature of either the People's case or the defendant's defense."

## APPENDIX II

CHRONOLOGY OF THE PROCEEDINGS RELEVANT TO THE
PRESENT APPEAL AND ATTACK ON THE TRANSCRIPT

February 18, 1948. Original informations filed in Los Angeles superior court.

February 20, 1948. Defendant, appearing with his counsel Morris Lavine, was arraigned on the information which charged both defendant and Knowles.

March 5, 1948. Defendant, appearing with his counsel V. L. Ferguson, was arraigned on the amended informations against him and Knowles, and on the information against defendant only. Time to plead continued to March 9.

March 9, 1948. Defendant appeared with his counsel V. L. Ferguson. Mr. Ferguson was relieved. Time to plead continued to March 12.

March 12, 1948. Defendant appeared; the public defender announced, ''We have been relieved''; defendant announced and insisted upon his intention to represent himself. He pleaded not guilty.

''Some time during the middle of March'' Deputy Public Defender Al Matthews, who had read the transcript of the preliminary hearing, called upon defendant and offered his services. Defendant refused them.

During the latter part of March, April, May, and June, Attorney William Roy Ives visited defendant in jail.

April 29, 1948. Defendant refused the services of the public defender and refused to have Mr. Matthews as legal adviser.

April 30, 1948. At defendant's request Mr. Matthews was appointed to act as legal adviser during the course of the trial.

June 25, 1948. Judgments of conviction rendered. Mr. Matthews' appointment terminated.

Later in 1948, and during 1949, defendant was in correspondence with Mr. Matthews.

In the summer of 1948 Attorney Rosalie S. Asher, at Mr. Matthews' request, visited defendant in San Quentin. Since then she has continued to advise defendant and, at times, to represent him as counsel of record.

November 1, 1948. Defendant's petition for prohibition attacking method of preparation of record filed in California Supreme Court. Denied without opinion November 22, 1948. (Crim. 4950.)

April 11, 1949. Mr. Fraser certified the portion of the reporter's transcript originally prepared by him.

May 10, 1949. Defendant sent to the superior court his written motion and affidavit attacking the transcript.

June 3, 1949. Judge Fricke certified the reporter's transcript.

June 10, 1949. Record on appeal filed in California Supreme Court.

June 15, 1949. The clerk of California Supreme Court wrote to defendant that the transcript had been filed; that Miss Asher had been in his office concerning papers filed by defendant; that if she or some other attorney was not going to represent defendant on appeal and defendant wished the court to appoint counsel he should make written request therefor.

June 30, 1949. Defendant's in propria persona ''Notice of Motion for Order of Supreme Court to Order Superior Court to Augment, Correct and Properly Certify Record, to Order a Hearing in the Superior Court,'' etc., filed in California Supreme Court. Thereafter defendant briefed a purported appeal ''from the final order of settlement and certification of Reporter's Transcript'' and filed other written motions and argument in support thereof. These matters were disposed of, as hereinafter stated, by opinion of May 19, 1950.

August 15, 1949. The California Supreme Court clerk wrote to defendant that defendant had failed to reply to the court's offer of June 15 to appoint counsel and asked defendant to advise the court whether he desired appointment of counsel.

September 21, 1949. At defendant's request, the California Supreme Court appointed Miss Asher as counsel.

September 23, 1949. At defendant's request Miss Asher's appointment was terminated.

May 12, 1950. Petition for habeas corpus attacking transcript filed in California Supreme Court. (Crim. 5110.)

May 19, 1950. *People* v. *Chessman*, 35 Cal.2d 455 [218 P.2d 769, 19 A.L.R.2d 1084], dismissed purported appeal from order of certification, granted defendant's motion to augment the reporter's transcript in two respects, and otherwise denied defendant's motions.

June 12, 1950. Petition for rehearing in *People* v. *Chessman* and petition for habeas corpus (Crim. 5110) denied without opinion by California Supreme Court.

October 9, 1950. Certiorari denied. *Chessman* v. *California*, 340 U.S. 840 [71 S.Ct. 29, 95 L.Ed. 616].

Further unsuccessful attacks on the transcript in the federal courts resulted in denial of certiorari on May 14, 1951. *Chessman* v. *California*, 341 U.S. 929 [71 S.Ct. 800, 95 L.Ed. 1359].

Meanwhile defendant continued his attacks on the transcript in the California Supreme Court upon the appeal on the merits and by petition for habeas corpus filed April 6, 1951. (Crim. 5217.)

December 18, 1951. Judgments affirmed. *People* v. *Chessman*, 38 Cal.2d 166 [238 P.2d 1001].

January 15, 1952. Rehearing in *People* v. *Chessman* and petition for habeas corpus (Crim. 5217) denied without opinion by California Supreme Court.

March 31, 1952. Certiorari denied. *Chessman* v. *California*, 343 U.S. 915 [72 S.Ct. 650, 96 L.Ed. 1330]. Rehearing denied, April 28, 1952, 343 U.S. 937 [72 S.Ct. 773, 96 L.Ed. 1344].

Defendant then again attacked the transcript in the federal district court (habeas corpus denied, June 9, 1952), the court of appeals (*Chessman* v *People* (May 28, 1953), 205 F.2d 128), and the United States Supreme Court. Certiorari denied, December 14, 1953, 346 U.S. 916 [74 S.Ct. 278, 98 L.Ed. 412]. Rehearing denied, February 1, 1954, 347 U.S. 908 [74 S.Ct. 430, 98 L.Ed. 1066].

In May, 1954, defendant retained Attorney Berwyn A. Rice.[1] On May 13, 1954, Mr. Rice filed in the Marin County superior court a petition for habeas corpus attacking the transcript. On May 24, 1954, after a hearing on affidavits with counsel for both parties present, the superior court denied the writ.

July 16, 1954. Petition for habeas corpus again attacking transcript filed in California Supreme Court. (Crim. 5632.) Denied without opinion, July 21, 1954.

October 25, 1954. Certiorari denied without prejudice to application for habeas corpus in the federal district court. *Chessman* v. *California*, 348 U.S. 864 [75 S.Ct. 85, 99 L.Ed. 681].

January 4, 1955. Petition for habeas corpus dismissed by federal district court. *In re Chessman*, 128 F.Supp. 600. Affirmed, *Chessman* v. *Teets* (April 7, 1955), 221 F.2d 276.

---

[1]Other attorneys who have since represented or acted as legal advisers to defendant in various proceedings include Jerome A. Duffy, Melvin Belli, George T. Davis, J. W. Ehrlich, Paul M. Posner, A. L. Wirin, and Ed Gritz, as well as Miss Asher.

October 17, 1955. Certiorari granted and case remanded to the district court for hearing on defendant's allegations of fraud in the preparation of the transcript. *Chessman* v. *Teets*, 350 U.S. 3 [76 S.Ct. 34, 100 L.Ed. 4].

January 31, 1956. After hearing the district court found against defendant's allegations of fraud and inaccuracy in the transcript, and discharged the writ of habeas corpus. *Chessman* v. *Teets*, 138 F.Supp. 761. The court of appeals affirmed. *Chessman* v. *Teets* (October 18, 1956), 239 F.2d 205.

April 8, 1957. The United States Supreme Court granted certiorari limited to the question ''whether, in the circumstances of this case, the state court proceedings to settle the trial transcript . . ., in which trial court proceedings petitioner allegedly was not represented in person or by counsel designated by the state court in his behalf, resulted in denying petitioner due process of law, within the meaning of the Fourteenth Amendment.'' *Chessman* v. *Teets*, 353 U.S. 928 [77 S.Ct. 720, 1 L.Ed.2d 722].

*June 10, 1957.* The federal Supreme Court remanded the cause to the federal district court ''with instructions to enter such orders as may be appropriate to allow California *a reasonable time within which to take further proceedings* not inconsistent with this opinion, failing which the petitioner shall be discharged.'' (Italics added.) *Chessman* v. *Teets*, 354 U.S. 156, 166 [77 S.Ct. 1127, 1 L.Ed.2d 1253].

August 14, 1957. After hearing the federal district court ordered that ''The Court allows California until December 1, 1957 to commence the proceedings for settlement of the trial transcript . . . At the request of petitioner and for his benefit to allow time for preparation for such proceedings, the court orders that such proceedings shall not commence prior to October 14, 1957.''

August 29, 1957. Obedient to the federal court orders and remand, the California Supreme Court vacated its May 19, 1950, order in *People* v. *Chessman*, 35 Cal.2d 455 [218 P.2d 769, 19 A.L.R.2d 1084], insofar as such order denied defendant's motion for an order that the superior court grant a hearing and augment, correct, and properly certify the record; recalled its remittitur issued January 21, 1952; vacated its judgment in *People* v. *Chessman*, 38 Cal.2d 166 [238 P.2d 1001]; and remanded the cause to the superior court ''for further proceedings not inconsistent with the opinion of the United States Supreme Court in *Chessman* v. *Teets* (June 10, 1957), 354 U.S. 156 [77 S.Ct. 1127, 1 L.Ed.2d 1253].''

September 10, 1957. On defendant's written motion the superior court ordered him transferred from San Quentin to the Los Angeles County Jail.

September 23 through November 22, 1957. The superior court on 12 occasions heard defendant in connection with his preparation for the resettlement hearings.

November 25, 1957, through February 14, 1958. The resettlement hearings before Judge Evans were had.

February 28, 1958. Judge Evans made his order that the reporter's transcript is substantially correct but that it should be corrected in respects specifically found by him to be immaterial.

April 2, 1958. Federal District Judge Louis E. Goodman denied defendant's ''Motion for Hearing and Discharge from Custody.'' (Civ. 34375.)

May 1, 1958. Judge Evans certified the corrected reporter's transcript on appeal and the transcripts (22 volumes of reporter's transcript and two volumes of clerk's transcript) of the resettlement proceedings.

May 13, 1958. Defendant, in San Quentin, received these transcripts.

June 16, 1958. Defendant's "Objections, Proposed Corrections, and Application for a Hearing," dated at San Quentin on May 26, 1958, were filed in the superior court and, so far as is here material, denied.

June 19, 1958. Corrected reporter's transcript filed in California Supreme Court. The clerk of such court notified defendant that his opening brief, according to rule 37 of the Rules on Appeal, must be served and filed within 30 days.

July 2, 1958. Defendant filed in California Supreme Court a petition for mandate attacking certain aspects of the resettlement proceedings, particularly the 90 changes in the transcript and the order appointing Mr. Fraser as an expert witness which were made in defendant's absence. (L.A. 25061.)

July 14, 1958. Defendant requested California Supreme Court for extension of time to file his opening brief to August 19, 1958.

July 16, 1958. The clerk of California Supreme Court wrote to defendant that the court, before acting on the application for extension of time, wished to know the name and address of the attorney who was to represent defendant on appeal.

July 19, 1958. Defendant wrote to the California Supreme Court clerk that he appeared, and intended to file his opening brief, in propria persona; that he hoped to arrange to have Miss Asher or Mr. A. L. Wirin argue the appeal orally; and that he would vigorously resist any effort of the court to appoint other counsel and did not believe it would be fair to Attorneys Asher and Wirin or to defendant for the court to seek to induce them to become counsel of record.

Mr. Wirin on July 26, 1958, and Miss Asher on July 29, 1958, wrote to the clerk of the California Supreme Court agreeing generally with the position taken by defendant in his letter of July 19.

August 7, 1958. On defendant's application to the California Supreme Court, the time to file his opening brief was extended to August 19, 1958.

August 18, 1958. On defendant's application to the California Supreme Court, time to file opening brief extended to September 3, 1958.

September 2, 1958. Defendant filed in California Supreme Court his opening brief on appeal, attacking both the judgments on the merits and the resettlement proceedings.

October 2, 1958. *Chessman* v. *Superior Court*, 50 Cal.2d 835 [330 P2d 225], granted in part the relief sought by defendant's petition for mandate (L.A. 25061) and ordered a hearing as to the 90 changes.

October 10, 1958. Respondent, on its application to California Supreme Court, granted to October 27, 1958, to file its brief.

October 17 and November 14, 1958. Defendant appeared in the superior court at hearings preparatory to the "re-resettlement" of the transcript.

November 10, 1958. Respondent, on its application to California Supreme Court, granted until ten days after the filing of the "re-resettled" record to file its brief.

November 24 and 25, 1958. The "re-resettlement" hearings were had in the Los Angeles Superior Court.

December 10, 1958. The California Supreme Court without opinion denied defendant's petition for mandate and prohibition attacking the "re-resettlement." (L.A. 25261.)

December 12, 1958. Judge Evans, in defendant's presence, again certified the corrected reporter's transcript on appeal.

December 18, 1958. Transcript received in California Supreme Court.

On affidavit dated December 31, 1958, respondent's time to file its brief in California Supreme Court extended to January 9, 1959.

January 12, 1959. Respondent's brief on the merits of the appeal filed in California Supreme Court.

January 20, 1959. After correspondence from both parties as to the filing of additional briefs, the clerk of California Supreme Court advised them that defendant could have until February 10, 1959, to serve and file his closing brief and a supplementary brief as to the ''re-resettlement''; respondent's answer to defendant's supplementary brief was to be served and filed by February 20, 1959; and defendant's reply to respondent's answer to defendant's supplementary brief was to be served and filed by March 3, 1959.

February 5, 1959. After further correspondence from both parties, the clerk of California Supreme Court advised them that defendant could have until February 10, 1959, to serve and file a supplementary opening brief; respondent could have 30 days to serve and file a reply to such supplementary opening brief; and defendant could have 20 days to serve and file his closing brief.

February 9, 1959. Defendant's supplementary opening brief filed in California Supreme Court.

March 13, 1959. Respondent's brief concerning the record filed in California Supreme Court.

April 7, 1959. On defendant's application (dated at San Quentin March 31, 1959, received in the warden's office on April 2, and filed in the California Supreme Court on April 7, 1959) defendant granted until May 5, 1959, to file closing brief.

April 26, 1959. Motion for leave to file petition for habeas corpus denied. *Chessman* v. *Dickson*, 359 U.S. 957 [79 S.Ct. 799, 3 L.Ed.2d 765].

May 4, 1959. Defendant's closing brief filed in California Supreme Court.

May 13, 1959. Pursuant to written request of defendant dated May 1 and received May 4, 1959, and with written consent of respondent dated and received May 13, 1959, oral argument waived and matter submitted to California Supreme Court on the briefs on file.